*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 07a0341p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

LEAGUE OF UNITED LATIN AMERICAN CITIZENS (LULAC), on behalf of its members; YOLANDA LEWIS, individually, as next friend of Sergio Chavez, and on behalf of all others similarly situated; and ALEX M. SIGUENZA, individually and on behalf of all others similarly situated,
　　　　　　　　　　*Plaintiffs - Appellants,*

GERALDINE M. GURDIAN, individually and on behalf of all others similarly situated,
　　　　　　　　　　*Plaintiff,*

　　　*v.*

PHIL BREDESEN, Governor of the State of Tennessee; and FRED PHILLIPS, Commissioner of the Tennessee Department of Safety,
　　　　　　　　　　*Defendants - Appellees,*

NANCY MURRAY and MICHAEL ALLEN,
　　　　　　　　　　*Defendants.*

No. 06-5306

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 04-00613—Todd J. Campbell, Chief District Judge.

Argued: March 13, 2007

Decided and Filed: August 28, 2007

Before: NORRIS, GILMAN, and McKEAGUE, Circuit Judges.

———————————

## COUNSEL

**ARGUED:** Jerry Gonzalez, Murfreesboro, Tennessee, for Appellants. Lynne T. Edgerton, OFFICE OF THE ATTORNEY GENERAL, STATE OF TENNESSEE, Nashville, Tennessee, for Appellees. **ON BRIEF:** Jerry Gonzalez, Murfreesboro, Tennessee, for Appellants. Lynne T. Edgerton, Lizabeth A. Hale, Michael A. Meyer, OFFICE OF THE ATTORNEY GENERAL, STATE OF TENNESSEE, Nashville, Tennessee, for Appellees.

1

McKEAGUE, J., delivered the opinion of the court, in which NORRIS, J., joined. GILMAN, J. (pp. 13-18), delivered a separate dissenting opinion.

------------

**OPINION**

------------

McKEAGUE, Circuit Judge.    This is an appeal from a judgment dismissing claims challenging Tennessee's driver license law as violative of certain aliens' right to equal protection and right to travel.  On due consideration of plaintiffs' complaint in light of the parties' appellate arguments, we affirm the district court's judgment that the complaint fails to state a claim upon which relief can be granted.

## I. BACKGROUND

For purposes of this appeal, plaintiffs in the action below include:  the League of United Latin American Citizens ("LULAC"), a not-for-profit organization dedicated to the advancement of the interests of the Hispanic population in the United States; Yolanda Lewis, a citizen of Mexico and resident of Tennessee, proceeding on her own behalf and on behalf of her minor son, Sergio Chavez; and Alex M. Siguenza, a citizen of Nicaragua and resident of Tennessee.  Defendants, sued in their official capacities, are Phil Bredesen, Governor of Tennessee; and Fred Phillips, Commissioner of the Tennessee Department of Safety.

In June 2004, plaintiff Alex Siguenza attempted to renew his Tennessee driver license in Nashville.  When he admitted that he was neither a United States citizen nor a lawful permanent resident, he was advised that he could not be issued a new driver license, but only a certificate for driving.  On July 9, 2004, plaintiff Yolanda Lewis attempted to obtain a Tennessee identification card for her 8-year old son, Sergio Chavez, in Nashville.  When she disclosed that Sergio was neither a United States citizen nor a lawful permanent resident, she was told that he was not entitled to any state-issued identification document.  As a non-lawful permanent resident, plaintiff Lewis, too, is not eligible for a driver license under Tennessee law.

Plaintiffs commenced this putative class action in the Middle District of Tennessee on July 12, 2004.  Plaintiff LULAC proceeds on behalf of its members (over 115,000 throughout the United States); Lewis proceeds on behalf of herself and her minor son and all others similarly situated; and Siguenza proceeds on behalf of himself and all others similarly situated.  The first amended complaint contains nine counts.  Only two are relevant to this appeal.  Both challenge provisions of 2004 Public Acts Chapter 778, amending Tennessee's driver license law, which became effective July 1, 2004.  In count I, plaintiffs proceed under 42 U.S.C. § 1983 and allege that Tenn. Code Ann. § 55-50-321(c)(1)(C), conditioning issuance of a driver license upon proof of United States citizenship or lawful permanent resident status, is a classification based on alienage that denies them equal protection of the law.  In count VI, plaintiffs seek a declaratory judgment to the effect that Tenn. Code Ann. § 55-50-321(c)(1)(C), by denying a driver license to some aliens, impermissibly burdens aliens' fundamental right to travel.  That lawful *temporary* resident aliens may obtain a "certificate for driving" instead, pursuant to Tenn. Code Ann. § 55-50-331(g), is said not to be an adequate substitute, because the certificate for driving, unlike a driver license, is explicitly "not valid for identification." Tenn. Code Ann. § 55-50-102(6).  Plaintiffs moved for a preliminary injunction to enjoin implementation of Chapter 778 and enjoin issuance of certificates for driving to aliens in lieu of driver licenses.  Plaintiffs also asked the court to require defendants to convert all certificates for driving already issued during 2004 into driver licenses.

        In an opinion and order dated September 28, 2004, the district court denied plaintiffs' motion for preliminary injunction. *League of United Latin American Citizens v. Bredesen*, No. 3:04-0613, 2004 WL 3048724 (M.D. Tenn. Sept. 28, 2004). This ruling has not been appealed. On November 23, 2004, the court granted the state defendants' motion to dismiss, thereby dismissing the claims contained in counts I and VI, which are the subject of this appeal. Incorporating by reference the reasoning set forth in its opinion denying preliminary injunction, the district court held that neither the equal protection claim nor the right to travel claim stated a claim upon which relief can be granted. The court concluded that issuance of a certificate for driving instead of a driver license does not infringe aliens' right to travel. *Id*. at *4-5. The court also concluded that the classification, treating illegal aliens and lawful temporary resident aliens differently than lawful permanent resident aliens, does not discriminate against a suspect class and does not burden a fundamental right. The court therefore held that the classification is subject to "rational basis" scrutiny. Applying rational basis scrutiny, the court went on to hold that the classification is rationally related to legitimate governmental purposes and is therefore not violative of equal protection. *Id*. at *5-6. The district court dismissed the claims under Fed. R. Civ. P. 12(b)(6). A final judgment order was entered on January 19, 2006 and this appeal followed.

## II. ANALYSIS

### A. Standard of Review

        Whether the district court properly dismissed plaintiffs' claims under Rule 12(b)(6) is a question of law subject to *de novo* review. *Kottmyer v. Maas*, 436 F.3d 684, 688 (6th Cir. 2006). The court must construe the complaint in the light most favorable to plaintiffs, accept all well-pled factual allegations as true and determine whether plaintiffs undoubtedly can prove no set of facts consistent with their allegations that would entitle them to relief. *Id*. Though decidedly liberal, this standard does require more than bare assertions of legal conclusions. *Bovee v. Coopers & Lybrand C.P.A.*, 272 F.3d 356, 361 (6th Cir. 2001). Plaintiffs' obligation to provide the "grounds" of their entitlement to relief requires more than labels and conclusions or a formulaic recitation of the elements of the cause of action. *Bell Atlantic Corp. v. Twombley*, — U.S. — , 127 S.Ct. 1955, 1964-65 (2007). The factual allegations, assumed to be true, must do more than create speculation or suspicion of a legally cognizable cause of action; they must show *entitlement* to relief. *Id.* at 1965. To state a valid claim, a complaint must contain either direct or inferential allegations respecting all the material elements to sustain recovery under some viable legal theory. *Id*. at 1969.

### B. Standing

        In granting the state defendants' motion to dismiss, the district court rejected their arguments that plaintiffs lacked standing to prosecute their claims. *LULAC*, 2004 WL 3048724 at *2. Accepting the allegations of plaintiffs' complaint at face value, the district court was satisfied that LULAC met the requirements of organizational standing as defined in *American Civil Liberties Union of Ohio Foundation, Inc. v. Ashbrook*, 375 F.3d 484, 489 (6th Cir. 2004).[1]

        The district court was similarly unpersuaded by the state defendants' contention that only illegal aliens, who are not members of a suspect class and are therefore entitled only to minimal protection under the Equal Protection Clause, would even arguably suffer the sort of harm that

---

        [1]"A voluntary membership organization has standing to sue on behalf of its members 'when (a) its members otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires participation of individual members in the lawsuit.'" *ACLU of Ohio*, 375 F.3d at 489 (quoting *Hunt v. Washington State Apple Adver. Comm.*, 432 U.S. 333, 343 (1977)).

would confer standing to bring these claims, because only illegal aliens are denied both a driver license and a certificate for driving under the new Tennessee law.[2] The court took note of plaintiffs' allegations that lawful temporary resident aliens, as a result of being issued a "not valid for identification" certificate for driving in lieu of a driver license, could experience difficulties in producing "satisfactory evidence of identification." *See* First Amended Complaint ¶¶ 22-27. This "satisfactory evidence of identification" is required under various provisions of Tennessee law in order to render a person charged with a misdemeanor offense or traffic rule violation eligible for issuance of a citation in lieu of arrest. *See, e.g.*, Tenn. Code Ann. § 40-7-118(c)(3).[3] Hence, plaintiffs impliedly allege that the denial of a driver license (a) makes it necessary for a lawful temporary resident alien to carry his or her passport and/or other immigration documents for personal identification purposes; and (b) increases the risk that he or she will be subject to arrest for any suspected minor infraction simply because a law enforcement officer may find his or her proof of identification unfamiliar and therefore "unsatisfactory." The district court was satisfied that such alleged potential difficulties are sufficient to make out the requisite injury to confer standing on lawful temporary resident aliens who reside in Tennessee.

On appeal, the state defendants do not challenge this latter ruling and we find no error in it.[4] As to LULAC's organizational standing, however, the state defendants renew their challenge, with a different twist. They contend, with reference to the standards set forth in *ACLU of Ohio*, that the complaint does not allege that any of the individually named plaintiffs is a LULAC member or that any LULAC member is a resident of Tennessee otherwise eligible for a Tennessee driver license or certificate for driving. Absent such allegations, i.e., that a member is subject to an actual or threatened injury, defendants contend LULAC cannot satisfy the requirements of organizational standing.

Plaintiffs respond first that this particular standing argument, having not been raised in the district court, has been effectively waived. Indeed, the general rule is that the court of appeals will not review issues raised for the first time on appeal. *Barner v. Pilkington N. Am.*, 399 F.3d 745, 749 (6th Cir. 2005). However, inasmuch as standing is a threshold requirement, it must be addressed, even in the first instance on appeal, because the court of appeals is obliged to satisfy itself of its own jurisdiction before proceeding to the merits of the appeal. *Children's Healthcare is a Legal Duty, Inc. v. Deters*, 92 F.3d 1412, 1419 (6th Cir. 1996) (Batchelder, J., concurring) (collecting cases); *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 102 (1998) ("Standing to sue is part of the common understanding of what it takes to make a justiciable case.").

---

[2] To establish standing to sue, an individual must demonstrate "(1) actual or threatened injury which is (2) fairly traceable to the challenged action and (3) a substantial likelihood the relief requested will redress or prevent the plaintiff's injury." *Id*. at 488-89.

[3] Although the term "satisfactory evidence of identification" is not defined in the Tennessee Code, its meaning has been clarified in the case law. *See State v. Walker*, 12 S.W.3d 460, 465 (Tenn. 2000) (adopting an "objectively reasonable" test for evaluating identification evidence and requiring that an officer have a "specific articulable reason to doubt that the cited person has accurately identified himself or herself before taking him or her into custody").

[4] The district court's determination that the injury-in-fact requirement is met is conclusory, but correct. 2004 WL 3048724 at *2. We are satisfied that the difficulties, inconvenience or hardship with which the new driver license law allegedly threatens plaintiffs represents an injury-in-fact within the zone of interests to be protected by the Equal Protection Clause and the constitutional right to travel. We further agree with the district court's determination, however, for reasons more fully set forth below, that plaintiffs' alleged injury, while sufficient to confer standing, is insufficient to make out a constitutional violation. *See Club Italia Soccer & Sports Organization Inc. v. Charter Tp. of Shelby*, 470 F.3d 286, 291-92 (6th Cir. 2006) (distinguishing between injury to interests within zone of interests protected by equal protection necessary to confer standing from injury necessary to prevail on merits of equal protection claim).

Secondly, notwithstanding any technical deficiency in their complaint, plaintiffs insist the record establishes that both individually named plaintiffs, Yolanda Lewis and Alex Siguenza, who have alleged that they are residents of Tennessee, *see* First Amended Complaint ¶¶ 7, 9, are also members of LULAC.  Indeed, their respective affidavits, filed in support of plaintiffs' motion for preliminary injunction, state that they are members of LULAC.  The affidavits also state that each is lawfully present in the United States and at least *imply*, consistent with the allegations of their complaint, that each is indeed a resident of Tennessee.  Accepted at face value, the unrefuted affidavits appear to satisfactorily answer defendants' reformulated standing challenge, demonstrating that LULAC members are affected by the Chapter 778 changes to Tennessee's driver license law and that LULAC therefore has organizational standing.

Defendants argue that their standing challenge was made in their motion to dismiss under Rule 12(b)(6) and that the sufficiency of plaintiffs' complaint should be tested based solely on the strength of its allegations, without assistance from matters outside the pleadings, like affidavits.  Yet, this precise argument, regarding the complaint's failure to expressly allege that LULAC members were harmed by Chapter 778, was not made below, at a time when plaintiffs could have moved for and been freely granted leave to amend their complaint to cure the defect.  *See* Fed. R. Civ. P. 15(a) (leave to amend "shall be freely granted when justice so requires").  Now, as the argument is raised first on appeal, it would not serve justice to dismiss the appeal at this point because of a technical pleading deficiency, in the face of undisputed record facts confirming that plaintiffs actually do have standing and did have standing to prosecute their claims when the complaint was filed.  *See Cleveland Branch, NAACP v. City of Parma, Ohio*, 263 F.3d 513, 524 (6th Cir. 2001) (standing is to be assessed under the *facts existing* when the complaint was filed).  Considering the present record in light of defendants' particular standing challenge, we conclude that plaintiffs have adequately cleared this "qualifying hurdle."  *See Children's Healthcare*, 92 F.3d at 1419.

We therefore find no error in the district court's holding that plaintiffs have standing to proceed with their claims.[5]

## C.  Equal Protection Claim

### 1. *Rational Basis or Heightened Scrutiny?*

(a) *Suspect Class*

The district court's dismissal of plaintiffs' equal protection claim is based on the conclusion that the classification drawn by Chapter 778, treating illegal aliens and lawful temporary resident aliens differently than lawful permanent resident aliens, is subject to "rational basis" scrutiny. Ordinarily a state law classification that "neither burdens a fundamental right nor targets a suspect class" will be upheld "so long as it bears a rational relation to some legitimate end." *Vacco v. Quill*, 521 U.S. 793, 799 (1997).  Plaintiffs contend the district court erred in applying rational basis scrutiny.  They argue that issuance of certificates for driving instead of driver licenses to aliens who are not lawful permanent residents represents a classification that discriminates against a suspect class, aliens, and infringes their fundamental right to travel.  These effects of Tennessee's driver license law are said to demand heightened scrutiny, requiring the court to "carefully examine" the governmental interest claimed to justify the discrimination and determine "whether that interest is

---

[5]Since we heard oral arguments and took this appeal under advisement, defendants have advised the Court that Tennessee's driver license law was materially amended on May 21, 2007, so as to render plaintiffs' claims moot.  2007 Public Acts Chapter 194.  Plaintiffs have responded by opposing the suggestion of mootness.  Indeed, though the amendatory act effectively repeals the challenged "certificate for driving" program, it does not take effect until October 1, 2007.  The suggestion of mootness is therefore premature.

legitimate and substantial" and "whether the means adopted to achieve the goal are necessary and precisely drawn." *Nyquist v. Mauclet*, 432 U.S. 1, 7 (1977) (quoting *Examining Board v. Flores de Otero*, 426 U.S. 572, 605 (1976)).

The district court recognized that aliens are "persons" and are protected under the Equal Protection Clause. *LULAC*, 2004 WL 3048724 at *3, n.1. The court further recognized that a classification based on alienage is suspect, citing *City of Cleburne, Texas v. Cleburne Living Center, Inc.*, 473 U.S. 432 (1985). *Id*. at *3. However, in reasoning clear and succinct, the court concluded that Chapter 778 does not discriminate based on alienage:

> This case is not about "citizens" versus "aliens." Plaintiffs argue that classifications based on alienage are inherently suspect. But the statute at issue does not classify persons based on alienage. The statutory classification in this case is between citizens and lawful permanent resident *aliens* on the one hand, and illegal *aliens* and those *aliens* who are not permanent lawful residents, on the other hand. Thus, the classification created by the drivers' license legislation is not between aliens and citizens. The drivers' license law does not distinguish among persons because of a protected classification. For instance, aliens can qualify for either a drivers' license or a drivers' certificate based on legitimate criteria other than alienage. Instead, the classification is based on the legality of the alien's presence in the country under federal law (lawful permanent resident aliens vs. illegal aliens) and/or the length of time the federal government has authorized the alien to stay in this country (permanent vs. temporary). Thus, the court is not persuaded that the legislation burdens a suspect class, and should be subjected to strict scrutiny analysis.

*Id*. (footnote omitted). The district court went on to hold that illegal aliens are not a suspect class, citing *Plyler v. Doe*, 457 U.S. 202, 223 (1982), and that the subclass of aliens legally admitted on a temporary basis is not a suspect class. *Id*. at *4.

On appeal, plaintiffs neither argue nor cite authority for the proposition that illegal aliens are a suspect class. They assert only the interests of a distinct subclass of aliens: those who are lawful *temporary* residents; i.e., aliens who are not lawful permanent residents; aliens whose authorized presence is tied to a specific purpose or defined period of time.[6] They argue that a classification which affects only some but not all aliens, must still be scrutinized strictly. In support, they rely primarily on *Nyquist v. Mauclet*, where "close judicial scrutiny" was applied to strike down a state law that prevented some but not all "resident aliens" from receiving state financial assistance for higher education. 432 U.S. at 7-8. Indeed, the *Nyquist* court held that the fact that the challenged statute discriminated against only a subclass of aliens did not obviate the need to apply heightened scrutiny. What was important to the *Nyquist* court was that the state law classification was "directed at aliens and that only aliens were harmed by it." *Id*. at 9.

---

[6]Plaintiffs' allegations *could* be construed as asserting the interests of illegal aliens. Defendants have insisted on so construing the complaint, despite the unrefuted evidence that the individual named plaintiffs are lawful temporary residents. Yet, considering that illegal aliens are not a suspect class, *Plyler*, 457 U.S. at 223, and considering plaintiffs' emphasis on the lawfulness of the individual named plaintiffs' presence in the United States in conjunction with their insistence on heightened scrutiny, we conclude that plaintiffs are not presently pursuing any claim on behalf of illegal aliens.

Furthermore, even if plaintiffs' complaint were deemed to assert the rights of illegal aliens, considering that illegal aliens are not a suspect class and any differential treatment of them would be subject only to rational basis scrutiny, it is apparent, for the reasons that follow, that counts I and VI, to the extent they state claims on behalf of illegal aliens, fail to pass muster.

The district court distinguished *Nyquist* on three bases:  (1) the harm flowing from the classification; (2) the fact that the *Nyquist* classification affected not just temporary, but also permanent resident aliens; and (3) the gravity of the state interest justifying the classification. *LULAC*, 2004 WL 3048724 at *4, n.3.  We conclude that all three distinctions are material and we agree with the district court that they compel a different outcome here than in *Nyquist*.

In *Nyquist*, a subclass of aliens, including permanent resident aliens, was denied a significant privilege under New York law,  state financial assistance for higher education.   The *Nyquist* court noted the unfairness implicit in disallowing permanent resident aliens, who were required to pay their full share of the taxes that supported the financial aid programs, from equal participation in those programs.  432 U.S. at 12.  Under Tennessee's driver license law, in contrast, lawful temporary resident aliens are not denied driving privileges or *any* other privilege.  Inasmuch as a certificate for driving issued to a lawful temporary resident alien undisputedly affords him or her the same driving privileges that a driver license affords a citizen or lawful permanent resident alien, the instant subclass of aliens hardly suffers any cognizable harm as a direct result of the classification.

In fact, plaintiffs' complaint is devoid of any allegation of actual harm suffered by a plaintiff. Their claims are premised rather on the *threat* of harm stemming from the *possibility* that the passport or other personal identification document a lawful temporary resident alien may carry in lieu of a driver license may not be accepted by a law enforcement officer or other third party as "satisfactory evidence of identification," to the alien's detriment.  This could lawfully occur only if there were objectively reasonable grounds to question the accuracy of the alien's passport or other identification paper.  *See* n. 3, *supra*.  While such potential difficulties stemming from the classification may represent an injury within the zone of interests protected by the Equal Protection Clause sufficient to confer standing, the fact that the claimed harm is so indirect and conjectural is not insignificant in determining whether heightened scrutiny of the state law classification is appropriate.  The harm flowing from the denial of financial aid in *Nyquist* was clearly more substantial than the hypothetical inconvenience or hardship posed by Tennessee's issuance of certificates for driving, instead of driver licenses, to lawful temporary residents.

The district court also distinguished *Nyquist* on the ground that Tennessee's interests in maintaining highway safety and public safety are more compelling than were New York's interests in limiting higher education financial aid to persons who were or would become eligible to vote. The district court deemed the issuance of certificates for driving to represent a reasonable exercise of traditional police power, allowing temporary resident aliens to operate motor vehicles without requiring the state to vouch for their identity.  *LULAC*, 2004 WL 3048724 at *4-5 (noting state's legitimate interest in preventing use of its governmental machinery to facilitate concealment of illegal aliens and other foreign nationals who may be involved in terrorist activities).

The district court's observation that Tennessee's public safety interest is stronger than the interest presented in *Nyquist* is plainly accurate.  *See Nyquist*, 432 U.S. at 10-12 (exposing weaknesses of New York's asserted interests).  Of course, the strength of the governmental interest supporting the classification is most appropriately considered if and after the classification is found to result in discriminatory harm to members of a suspect class.  Yet, the governmental purpose is not entirely immaterial in determining the appropriate level of scrutiny.  That the harm complained of is practically *de minimis* and results from the exercise of traditional police power are factors that distinguish this case from *Nyquist* and counsel in favor of deferential review of the classification.

Still, it is the district court's third basis for distinguishing *Nyquist* that is most important. In *Nyquist*, the plaintiffs were lawful *permanent* resident aliens who were subject to discriminatory harm and were treated as members of a suspect class.  The reason this is critical is well explained

in *LeClerc v. Webb*, 419 F.3d 405 (5th Cir. 2005). In *LeClerc*, the Fifth Circuit noted that, although classifications based on alienage are inherently suspect, the Supreme Court has employed strict scrutiny with respect to only one subclass of aliens: lawful permanent residents. *Id*. at 415-16. The state laws presented in cases such as *Nyquist* were deemed to warrant "close judicial scrutiny because they took positions seemingly inconsistent with the congressional determination to admit the alien to *permanent residence*." *Id*. at 417 (quoting *Foley v. Connelie*, 435 U.S. 291, 295 (1978)) (emphasis added in *LeClerc*).

The *LeClerc* court explained at length why lawful temporary resident aliens, or "nonimmigrant aliens," are not entitled to the same protection as lawful permanent resident aliens. *Id*. at 417-20. In short, the court recognized that permanent resident aliens are "virtual citizens" who are "legally entrenched in society" but who lack the ability to participate in the political process. *Id*. at 417. This inability renders them "a prime example of a discrete and insular minority for whom [ ] heightened judicial solicitude is appropriate." *Id*. (*quoting In re Griffiths*, 413 U.S. 717, 721 (1973)). Permanent resident aliens are similarly situated to citizens in economic, social, and civic conditions as well. Like citizens, they pay taxes, support the economy, serve in the armed forces, and are entitled to reside permanently in the United States. *Id*. at 418.

Temporary resident aliens, on the other hand, are admitted to the United States only for the duration of their authorized status, are not permitted to serve in the U.S. military, are subject to strict employment restrictions, incur differential tax treatment, and may be denied federal welfare benefits. *Id*. at 418-19. Because of these aggregate factual and legal differences, the *LeClerc* court declined to hold that nonimmigrant lawful temporary resident aliens comprise a suspect class entitled to the extraordinary protection of strict scrutiny: "We decline to extend the Supreme Court's decisions concerning [permanent] resident aliens to different alien categories when the Court itself has shied away from such expansion." *Id*. at 419. The court went on to hold that rational basis review is the appropriate standard for evaluating state law classifications affecting nonimmigrant aliens. *Id*. at 420.

We find the analysis set forth in *LeClerc* to be persuasive. There are abundant good reasons, both legal and pragmatic, why lawful permanent residents are the only subclass of aliens who have been treated as a suspect class. This case presents no compelling reason why the special protection afforded by suspect-class recognition should be extended to lawful temporary resident aliens. Because the instant classification does not result in discriminatory harm to members of a suspect class, it is subject only to rational basis scrutiny.

The appropriateness of this conclusion is underscored by the fact that the classification drawn by Tennessee law, unlike that presented in *Nyquist*, is in no way inconsistent with federal law, but rather mirrors it. As the district court observed, Chapter 778 does not deny any benefit of state law to lawful temporary resident aliens. It merely serves to deny state-issued proof of identification to any alien whose presence the federal government has refrained from permanently authorizing, so as to avoid the appearance that the State of Tennessee is vouching for his or her identity. The alien issued a certificate for driving is free to drive on the highways of Tennessee and free to use his or her own passport or other identification papers as needed. Despite plaintiffs' efforts to depict Chapter 778 as reflective of invidious discrimination against aliens warranting close judicial scrutiny, the classification drawn is, on its face, sensible and directly derivative of aliens' status under immigration law.[7][8]

_____

[7]Plaintiffs fault the district court for failing to address specially their claim on behalf of minor Sergio Chavez, who, as alleged in count I of the complaint, was denied photo identification because he is not a lawful permanent resident alien. They contend the classification, as it applies to him, is subject to heightened rational basis scrutiny, per *Plyler*, 457 U.S at 223, because Chavez is a minor. In *Plyler*, the Supreme Court recognized that a state law classification that

(b) *Fundamental Right to Travel*

Plaintiffs correctly argue that even in the absence of a suspect class, a classification warrants strict scrutiny if it burdens the exercise of a fundamental right. They argue that denial of a driver license that may be used for identification purposes burdens their fundamental right to travel. The district court recognized that the Supreme Court has recognized a protected right to interstate travel, *Saenz v. Roe*, 526 U.S. 489, 500 (1999), and the Sixth Circuit has recognized a protected right to intrastate travel, i.e., "a right to travel locally through public spaces and roadways," *Johnson v. City of Cincinnati*, 310 F.3d 484, 494-98 (6th Cir. 2002). *LULAC*, 2004 WL 3048724 at *4. Yet, the district court held the protected right to travel does not embody a right to a driver license or a right to a particular mode of transportation, citing *Duncan v. Cone*, 2000 WL 1828089 (6th Cir.) (unpublished) (holding "there is no fundamental right to drive a motor vehicle."); *John Doe No. 1 v. Georgia Dep't of Public Safety*, 147 F. Supp. 2d 1369, 1375 (N.D. Ga. 2001) (observing that "the Circuit Courts have uniformly held that burdens on a single mode of transportation do not implicate the right to interstate travel," and collecting cases). Further, the district court held that the right to travel, whatever its contours, is not infringed by Chapter 778 because a person who receives a certificate for driving is able to operate a motor vehicle just like a person who receives a driver license. *LULAC*, 2004 WL 3048724 at *5. Potential difficulties that may be experienced by one who does not have a driver license to use for identification purposes were held not to implicate the right to travel.

In *Saenz*, the Supreme Court identified three components of the right to travel: "It protects the right of a citizen of one State to enter and to leave another State, the right to be treated as a welcome visitor rather than an unfriendly alien when temporarily present in the second State, and, for those travelers who elect to become permanent residents, the right to be treated like other citizens in that State. 526 U.S. at 500. Plaintiffs have not identified, nor have we uncovered, any authority for the proposition that lawful temporary resident aliens enjoy the same fundamental right to travel that citizens do. Yet, even assuming temporary resident aliens' right to travel is constitutionally protected, the question remains whether such right is impermissibly burdened by Chapter 778.

---

imposed a "lifetime hardship on a discrete class of children not accountable for their disabling status" could not be considered rational unless it furthered some "substantial" goal of the state. *Id.* at 223-24. Here, in contrast, plaintiffs have failed to identify *any* hardship visited upon Chavez by the denial of photo identification that would warrant heightened rational basis scrutiny.

[8]We are neither oblivious to nor persuaded by the concerns raised in our esteemed colleague's dissenting opinion. In this case, as in many, the answer depends on how the question is framed. The dissent charges us with applying an overly narrow construction of, or carving out an unwarranted exception to, existing Supreme Court precedent in a way that reflects "a value judgment as to the status of legal aliens in our society." By affirming the lower court's order dismissing plaintiffs' action for failure to state a valid claim, we are said to have "created a rule" that could be significantly more harmful to nonimmigrant aliens in other contexts than the classification drawn by the Tennessee Legislature in this case.

First, the question posed is whether the district court erred in dismissing the specific equal protection claim brought by plaintiffs in their complaint. The dissent's concern about "other contexts" invites speculation immaterial to resolution of the issues posed by the instant claim. By focusing on the particular statute challenged and the specific concrete harm alleged by plaintiffs, we adhere to our proper judicial role. We are not distracted by "other contexts" not before the court and we do not purport to create any generally applicable "rule." Our holding—that Tennessee's issuance of certificates for driving to temporary resident aliens, in lieu of driver licenses, is not subject to heightened scrutiny—is explicitly tied to the facts that (1) Tennessee's classification, far from evidencing invidious discrimination, is not only consistent with, but actually mirrors federal law; and (2) the classification works practically no cognizable harm, but only speculative inconvenience. Our more deferential approach to Tennessee's legislative judgment, based on the Supreme Court's guidance in *Nyquist* and other precedents, as elaborated on in *LeClerc*, is thus born of due respect for principles of federalism and comity, and bespeaks no "value judgment" on the status of legal aliens in our society.

A state law implicates the right to travel when it actually deters travel, when impeding travel is its primary objective, or when it uses a classification that serves to penalize the exercise of the right. *Attorney General of New York v. Soto-Lopez*, 476 U.S. 898, 903 (1986). Tennessee's issuance of certificates for driving, which confer all the same driving privileges as driver licenses, is clearly not designed primarily to impede travel and can hardly be said to deter or penalize travel. The state's denial of state-issued photograph identification to temporary resident aliens may arguably result in inconvenience, requiring the bearer of a certificate for driving to carry other personal identification papers, but this inconvenience can hardly be said to deter or penalize travel. To the extent this inconvenience burdens exercise of the right to travel at all, the burden is incidental and negligible, insufficient to implicate denial of the right to travel. *See Town of Southold v. Town of East Hampton*, 477 F.3d 38, 54 (2d Cir. 2007) (collecting cases recognizing that even citizens do not have a constitutional right to the most convenient form of travel). Something more than a negligible or minimal impact on the right to travel is required before strict scrutiny is applied. *State of Kansas v. United States*, 16 F.3d 436, 442 (D.C. Cir. 1994).

Plaintiffs contend it is conceivable that they could prove the certificate for driving might not be accepted by an insurance company as satisfactory evidence of identification. If they could not obtain automobile insurance, they argue, they would be prevented from driving legally in Tennessee. While the argument is "conceivable," it is hardly plausible. Plaintiffs offer no reason to believe any insurance company would find a passport or other personal identification document, presented in conjunction with a certificate for driving, inadequate for issuance of automobile insurance.[9] Even if such an eventuality were deemed plausible, its occurrence and the resulting incidental "burden" on travel would hardly be attributable to Chapter 778, but rather to a private entity's exercise of business discretion. Plaintiffs' argument is simply too speculative, factually and legally, to justify the conclusion that their right to travel is impermissibly burdened by issuance of a certificate for driving that is not valid for identification.

Accordingly, we find no error in the district court's determination that rational basis scrutiny applies, because Chapter 778 implicates neither a suspect class nor a fundamental right.

## 2. *Rational Relationship to Legitimate Government Purpose*

Under traditional rational basis scrutiny, a state law classification will be upheld "so long as it bears a rational relation to some legitimate end." *Vacco*, 521 U.S. at 799. The reason for such deferential review is explained as follows:

> The initial discretion to determine what is "different" and what is "the same" resides in the legislatures of the States. A legislature must have substantial latitude to establish classifications that roughly approximate the nature of the problem perceived, that accommodate competing concerns both public and private, and that account for limitations on the practical ability of the State to remedy every ill. In applying the Equal Protection Clause to most forms of state action, we thus seek only the assurance that the classification at issue bears some fair relationship to a legitimate public purpose.

*LeClerc*, 419 F.3d at 420 (quoting *Plyler*, 457 U.S. at 216).

---

[9] In fact, a recent Wall Street Journal article reported that automobile insurance companies are increasingly targeting unlicensed illegal aliens as a lucrative market. Miriam Jordan, *Illegal Residents Get Legal Route to Car Coverage*, The Wall Street Journal, May 1, 2007, at A1, *available at* http://online.wsj.com/article/SB117798644243587739.html. If insurance is readily available to illegal aliens, the notion that lawful temporary resident aliens may be denied coverage is simply not plausible.

The district court accepted that Chapter 778's classification was designed to serve homeland security interests by indicating to third parties that the State of Tennessee does not vouch for the identity of the person holding a certificate for driving while at the same time allowing the holder of the certificate to validly operate a motor vehicle in Tennessee. The court concluded that the balancing of interests achieved by issuing certificates for driving to aliens who are not lawful permanent residents is rationally related to this purpose.

Plaintiffs do not directly challenge this aspect of the district court's ruling. They argue that, irrespective of the level of scrutiny employed, the classification must be carefully examined to ensure that it rationally furthers some legitimate, articulated purpose. This careful examination can hardly be conducted, they contend, based on the pleadings alone pursuant to Rule 12(b)(6).

In urging this "careful" or "stringent" examination, plaintiffs rely on cases that addressed discriminatory treatment of suspect classes, i.e., cases that employed heightened scrutiny. *See Examining Board*, 426 U.S. at 605; *Griffiths*, 413 U.S. at 721-22. However, a classification such as Chapter 778, subject to rational basis review, is accorded a "strong presumption of validity." *Heller v. Doe by Doe*, 509 U.S. 312, 319 (1993). The state has no obligation to produce evidence sustaining the rationality of the classification. *Id*. at 320. To overcome this strong presumption of validity, a challenger has the burden of negating all possible rational justifications for the classification. *Id*.; *Gean v. Hattaway*, 330 F.3d 758, 771 (6th Cir. 2003).

Plaintiffs have not carried this burden either in their pleadings or in their appellate arguments. The district court's conclusion that the state's interest—in refraining from vouching for the identity of aliens who have not been granted permanent resident status by the federal government but whose permission to stay here is tied to a specific purpose or period of time—is legitimate and rationally served by Chapter 778 has not been shown to be erroneous. For the reasons set forth above, it is apparent that, even upon viewing the allegations of plaintiffs' complaint in the light most favorable to plaintiffs, they fail to set forth a factual basis upon which relief can be granted under the Equal Protection Clause. That the classification might ultimately be shown to have been drawn unnecessarily broadly and to result in differential treatment and even inconvenience is of no consequence where the classification is subject only to deferential rational basis scrutiny. *See Heller*, 509 U.S. at 321 (observing that a classification does not fail rational basis review simply because it is not made with "mathematical nicety" or because it results in some inequality). This is because, under rational basis review, the court is obliged "to accept a legislature's generalizations even when there is an imperfect fit between means and ends." *Id*.

Accordingly, plaintiffs have failed to demonstrate that the challenged classification is not rationally related to a legitimate government purpose. The district court's dismissal of their equal protection claim for failure to state a claim upon which relief can be granted must therefore be affirmed.

### D. Right to Travel Claim

Plaintiffs have asserted their constitutionally protected right to travel in two contexts: first, in support of their argument in support of their count I equal protection claim that Chapter 778 should be subjected to strict scrutiny; and second, in support of their separate count VI claim for infringement of their fundamental right to travel. As outlined above, the district court determined that plaintiffs' claims fail to adequately allege that their right to travel is actually burdened by Chapter 778. For the same reasons that the district court properly concluded that the asserted infringement of the right to travel does not warrant strict scrutiny of Chapter 778, it also properly concluded that count VI fails to state a proper claim. We therefore uphold the district court's dismissal of the count VI.

## III. CONCLUSION

Plaintiffs' arguments for heightened scrutiny of Chapter 778 are based on allegations too conclusory and conjectural to justify the inferences required to satisfy the essential elements of their claims. Their claims do not, therefore, withstand scrutiny even under the decidedly liberal standard of Rule 12(b)(6). Accordingly, the judgment of the district court, dismissing plaintiffs' count I claim for denial of equal protection as well as their count VI claim for violation of their right to travel, is **AFFIRMED**.

————————————

**DISSENT**

————————————

RONALD LEE GILMAN, Circuit Judge, dissenting. The majority concludes that the district court properly applied rational-basis review to a Tennessee law that differentiates between temporary resident legal aliens (alternately referred to as nonimmigrant aliens) and permanent resident legal aliens (alternately referred to as immigrant aliens). Because I believe that this classification discriminates against a suspect class, I dissent on the ground that the district court should have applied strict scrutiny instead of rational-basis review. *See Graham v. Richardson*, 403 U.S. 365, 372 (1971) ("[C]lassifications based on alienage, like those based on nationality or race, are inherently suspect and subject to close judicial scrutiny.").

A key consequence of applying strict scrutiny is that the burden of proof shifts from the plaintiffs to the defendants. *Compare Midkiff v. Adams County Reg'l Water Dist.*, 409 F.3d 758, 770 (6th Cir. 2005) ("Under rational basis review, a plaintiff faces a severe burden and must negate all possible rational justifications for the distinction." (quotation marks omitted)), *with Middleton v. City of Flint*, 92 F.3d 396, 404 (6th Cir. 1996) ("Under [strict scrutiny], [the defendant] must prove that it had a compelling state interest when it enacted its plan, and that the plan is narrowly tailored to further that compelling state interest."). I therefore believe that we should remand the case to the district court for a more complete development of the record under the proper standard of review.

## I. ANALYSIS

LULAC challenges a Tennessee state law that precludes temporary resident legal aliens from obtaining a full driver's license. They can instead obtain only a driver's certificate, which entitles them to the same driving privileges as both permanent resident legal aliens and citizens, but denies them the benefit of official state identification. In fact, the certificates state in bold letters "NOT VALID FOR IDENTIFICATION," or some substantially similar phrase. The principal issue in this case is whether the Tennessee law's differentiation between permanent and temporary resident legal aliens implicates a suspect class so as to warrant strict scrutiny. The majority concludes that it does not, and that rational-basis review is accordingly the proper standard. To support this conclusion, the majority relies on the majority opinion in the only other federal-circuit case to have decided this precise issue: *LeClerc v. Webb*, 419 F.3d 405 (5th Cir. 2005). Curiously, neither party cited *LeClerc* in their briefing.

In *LeClerc*, the principal reason that the Fifth Circuit declined to extend strict scrutiny to laws discriminating against nonimmigrant aliens was that "the [Supreme] Court itself has shied away from such expansion." 419 F.3d at 419. The majority finds this reasoning persuasive. Maj. Op. at 8. To be sure, the Supreme Court has never specifically held that temporary resident legal aliens, as a subset of all aliens, are a suspect class for equal-protection purposes. But this silence alone proves little. As an initial matter, equal protection is not one of those substantive areas of the law where, as in the case of qualified immunity under 42 U.S.C. § 1983 or federal habeas corpus under AEDPA, the degree to which Supreme Court precedent is "clearly established" determines the likelihood of relief.

In addition, the Supreme Court has addressed intra-alienage classifications in state laws only a handful of times since 1900—an inordinately small "sample size" from which to conclude with certainty either that the classifications addressed in those cases collectively constitute an exhaustive list or that an as-yet-unaddressed classification would necessarily receive different treatment from the Court. A closer look at three of those cases strongly suggests that a classification of the kind at

issue here would receive the same strict scrutiny that each of the classifications in those cases received.

The first case is *Takahashi v. Fish & Game Comm'n*, 334 U.S. 410 (1948), where the Supreme Court applied strict scrutiny to, and ultimately held unconstitutional, a California law that prohibited only those lawful aliens who were not eligible for federal citizenship—a group that, at the time, included all Japanese aliens—from fishing in the ocean off of the state's shores. Even though the classification was only intra-alienage, as opposed to all aliens versus citizens, the Court found strict scrutiny to be appropriate. The Court noted in relevant part that

> [a]ll of the foregoing emphasizes the tenuousness of the state's claim that it has power to single out and ban its lawful alien inhabitants, and particularly certain racial and color groups within this class of inhabitants, from following a vocation simply because Congress has put some such groups in special classifications in exercise of its broad and wholly distinguishable powers over immigration and naturalization.

*Id.* at 420. Similarly, the Court determined that California's justification for the law was "inadequate to justify California in excluding any or all aliens who are lawful residents of the State from making a living by fishing in the ocean off its shores while permitting all others to do so." *Id.* at 421.

LULAC persuasively argues that the classification at issue in the present case is in effect the same as that at issue in *Takahashi*—that is, between citizens and those aliens eligible for citizenship, on the one hand, and all other aliens, on the other—because only permanent resident legal aliens are eligible for citizenship under federal law. The majority, however, does not address this argument in its opinion.

*Graham v. Richardson*, 403 U.S. 365 (1971), is the second case on point. The Supreme Court, citing *Takahashi*, again applied strict scrutiny to, and ultimately held unconstitutional, an Arizona law that denied welfare benefits to those aliens who failed to meet a 15-year durational residency requirement. All other aliens, as well as citizens, were exempt. *Id.* at 367. The Court reiterated its prior precedent that "whatever may be the scope of the constitutional right of interstate travel, *aliens lawfully within this country* have a right to enter and abide in any State in the Union 'on an equality of legal privileges with all citizens under nondiscriminatory laws.'" *Id.* at 377-78 (quoting *Takahashi*, 344 U.S. at 420) (emphasis added). Most importantly, *Graham* made explicit what the analysis in *Takahashi* and the rest of the Court's alienage jurisprudence had necessarily implied—namely, that "classifications based on alienage, like those based on nationality or race, are inherently suspect and subject to close judicial scrutiny" because "[a]liens as a class are a prime example of a 'discrete and insular' minority for whom such heightened judicial solicitude is appropriate." *Id.* at 371-72 (citing *United States v. Carolene Prods. Co.*, 304 U.S. 144, 152-53 n.4 (1938)) (footnotes omitted).

The third and final case on point is *Nyquist v. Mauclet*, 432 U.S. 1 (1977), where the Supreme Court, citing *Graham*, applied strict scrutiny to, and ultimately held unconstitutional, a New York law barring only certain resident aliens from receiving financial assistance from the state for higher education. Those resident legal aliens who had applied for citizenship, as well as those who were not yet qualified for citizenship but had filed statements indicating an intent to qualify and apply, were exempt from the prohibition and allowed to participate in the assistance program. *Id.* at 3-4. Most pertinently, the Court stated that "[t]he fact that the [challenged] statute is not an absolute bar [against all aliens] does not mean that it does not discriminate against the class." *Id.* at 9. Instead, "[t]he important points are that [the challenged statute] is directed at aliens and that only aliens are harmed by it." *Id.*

The majority adopts virtually the entirety of the *LeClerc* majority's analysis to distinguish the Supreme Court precedents discussed above, but it does so without even mentioning the numerous criticisms to which that analysis has been subject. In so doing, it also overlooks many of the plaintiffs' related arguments on appeal. A brief review of the procedural history in *LeClerc* reveals the considerable extent—and passion—of those criticisms.

*LeClerc* was a consolidated appeal from two diametrically opposed opinions from the United States District Court for the Eastern District of Louisiana. In *LeClerc v. Webb*, 270 F. Supp. 2d 779 (E.D. La. 2003), the district court determined that a Louisiana law precluding nonimmigrant aliens from sitting for the state's bar exam was subject to only rational-basis review. In contrast, a different judge on the same court in *Wallace v. Calogero*, 286 F. Supp. 2d 748, 762 (E.D. La. 2003), held that the law triggered strict scrutiny because nonimmigrant aliens were part of the general "resident alien" suspect class. This difference in the applicable standard of review, moreover, proved dispositive: The district court in *LeClerc* upheld the law, 270 F. Supp. 2d at 801, whereas the court in *Wallace* declared it "unenforceable," 286 F. Supp. 2d at 764.

The debate continued once the cases had been consolidated for appeal before the Fifth Circuit. Judge Stewart issued a lengthy and detailed dissent to Judge Jones's majority opinion. In his dissent, Judge Stewart vigorously disputed the majority's conclusion that nonimmigrant aliens were not a suspect class and that laws discriminating against them were therefore subject to only rational-basis review. As an initial matter, Judge Stewart dismissed as unfounded the majority's wariness "about 'expanding' strict scrutiny review to nonimmigrant aliens as a distinctive suspect class in the absence of a black letter holding by the U.S. Supreme Court to that effect." *LeClerc*, 419 F.3d at 426 (Stewart, J., dissenting). He instead emphasized that "the Supreme Court's statement [in *Graham*] that 'alienage is a suspect class' by definition includes nonimmigrant aliens as part of that class." *Id.* The Court's post-*Graham* caselaw has only reinforced that literal meaning, in Judge Stewart's opinion, because "the Court has still spoken of a general 'alien' suspect class" "[d]espite the Court's familiarity with the distinction between immigrant and nonimmigrant aliens." *Id.* at 428.

Judge Stewart especially took exception to the majority's "heavy" reliance on the statement in *Application of Griffiths*, 413 U.S. 717, 722 (1973), that "[r]esident aliens, like citizens, pay taxes, support the economy, serve in the Armed Forces, and contribute in myriad other ways to our society." First, he noted that nonimmigrant aliens, as a matter of fact, "do pay taxes, support the economy and contribute in other ways to our society." *LeClerc*, 419 F.3d at 428 (Stewart, J., dissenting). In addition, he argued that a focus on "an aliens' [sic] ability to serve in the Armed Forces or pay taxes" is misplaced because, as a matter of law, "the basis for aliens' [suspect] class designation seems to be premised on aliens' inability to vote, and thus their impotence in the political process, and the long history of invidious discrimination against them." *Id.* at 428-29 (citing *Plyler v. Doe*, 457 U.S. 202, 218 n.14 (1982), Erwin Chemerinsky, Constitutional Law 618-19 (1997), and *Takahashi*, 334 U.S. 410).

The Supreme Court's post-*Graham* caselaw directly supports Judge Stewart's criticism. *See, e.g.*, *Regents of the Univ. of Calif. v. Bakke*, 438 U.S. 265, 290, 290 n.28 (1978) (noting that, although the Court has never held that "discreteness and insularity constitute necessary preconditions to a holding that a particular classification is invidious," "these elements have been relied upon in recognizing a suspect class in only one group of cases, those involving aliens" (citing *Graham*, 403 U.S. at 372)); *Foley v. Connelie*, 435 U.S. 291, 294 (1978) (clarifying that the *Graham* court's rationale for subjecting alienage-based classifications to "heightened judicial solicitude" was that "aliens—pending their eligibility for citizenship—have no direct voice in the political processes" (citing *Carolene Prods.*, 304 U.S. at 152-53 n.4)); *see also* Recent Cases, *Fifth Circuit Holds That Louisiana Can Prevent Nonimmigrant Aliens From Sitting for the Bar*, 119 Harv. L.

Rev. 669, 674 (2005) ("That nonimmigrant aliens work under a different tax structure, cannot serve in the military, and face mandatory departure from the United States, for example, does not justify offering them less constitutional protection; *if anything, these restrictions render them more powerless and vulnerable to state predations—more 'discrete and insular.'*" (citing *Carolene Prods.*, 304 U.S. at 153 n.4) (emphasis added)).

Judge Stewart's dissent was not the Fifth Circuit's final word on *LeClerc*. Following the decision of the three-judge panel, the plaintiffs petitioned for rehearing en banc. The court denied the petition by the narrowest possible vote of 8 to 7. *LeClerc v. Webb*, 444 F.3d 428 (5th Cir. 2006). Two of the seven judges who would have reheard the case en banc filed dissenting opinions from the denial of the petition. In addition to Judge Stewart, who effectively reprised his original dissent, Judge Higginbotham used pointed language to highlight both the weaknesses and the consequential dangers in the majority's analysis. He described the majority's decision to exclude nonimmigrant aliens from suspect-class designation as "a bold step not sanctioned by Supreme Court precedent." *Id.* at 429 (Higginbotham, J., dissenting from the denial of rehearing en banc). Judge Higginbotham also criticized the majority for its "puzzling" silence in ignoring the doctrine of federal preemption, or what he referred to as "the trumping constitutional power of the federal government in controlling the nation's borders, including matters of immigration and naturalization." *Id.* Specifically, he found that the majority's decision to "relax[] scrutiny of state regulation of aliens as the federal regulation of them is increased" "is too ambitious for me." *Id.* at 430; *see also id.* at 429-30 (calling the *LeClerc* majority's reasoning "perverse" and "exactly backwards" because, in "draw[ing] distinctions between different classes of aliens, it shifts responsibility over aliens from the Congress to the States").

Commentators have also questioned the analysis in *LeClerc*. One has referred to the majority opinion as a "short-sighted and bureaucratic decision that misconstrues precedent and misapplies equal protection analysis." Recent Cases, 119 Harv. L. Rev. at 670. Most "counterintuitive," in that commentator's opinion, was the majority's insistence on nonimmigrant aliens' temporariness given that "the Supreme Court [has] never differentiated equal protection review based on status as an immigrant or a nonimmigrant alien" and that "the governing cases also appear to downplay the relevance of aliens' transience." *Id.* at 673; *see also LeClerc*, 419 F.3d at 428 (Stewart, J., dissenting) ("Despite the Court's familiarity with the distinction between immigrant and nonimmigrant aliens, the Court has still spoken of a general 'alien' suspect class."). This nondifferentiation, moreover, could be, and has been, read as "implying that the precise status is not [the Supreme Court's] focus, as long as it is a legal status." Kathleen Ann Harrison, LeClerc v. Webb*: Rational Scrutiny Analysis of Equal Protection Claims by Nonimmigrant Aliens*, 25 Miss. C. L. Rev. 273, 281 (2006). Indeed, as discussed in greater detail below, the only exception to the *Graham* rule that aliens are a suspect class is in regard to *illegal* aliens. *See Plyler*, 457 U.S. at 219 n.19 ("We reject the claim that 'illegal aliens' are a 'suspect class.'").

No matter the specific nature of their respective criticisms, the commentators have shared Judge Higginbotham's overarching concern about *LeClerc*'s "bold step" and its significance for the future. That is, the exclusion of nonimmigrant aliens from suspect-class designation "may be setting a dangerous precedent that could serve to erode the rights of nonimmigrants in other contexts." Harrison, 25 Miss. C. L. Rev. at 282; *see also* Recent Cases, 119 Harv. L. Rev at 676 n.62 ("[P]ermitting state governments to single out nonimmigrant aliens in this manner could promote anti-alien employment discrimination based on seemingly neutral qualities like 'transience.'"). Those "other contexts," of course, could be significantly more harmful to nonimmigrants as a class than the exclusion from a state bar exam, as in *LeClerc*, or the inability to obtain a regular state driver's license, as in the present case.

The majority here, however, fails to address any of these criticisms and, in fact, never acknowledges that there was a dissent in *LeClerc* at all. Even the majority in *LeClerc* itself recognized the closeness of the issue, conceding that the relevant Supreme Court precedent contained "some ambiguity." 419 F.3d at 415. Although my specific reasons for dissenting largely mirror those already expressed by Judges Stewart and Higginbotham, and in turn are echoed by the commentators, I believe that a larger jurisprudential principle is driving the debate.

At its most basic level, my disagreement with the majority here and in *LeClerc* is a fundamental difference of opinion regarding the proper role of the federal circuit courts in addressing issues that the Supreme Court itself has never specifically resolved. The majority appears to adopt the cautionary approach of the *LeClerc* majority, "declin[ing] to extend the Supreme Court's decisions concerning [permanent] resident aliens to different alien categories when the Court itself has shied away from such expansion." Maj. Op. at 8 (quoting *LeClerc*, 419 F.3d at 419). I, on the other hand, would adopt what is in essence the more literal approach, taking the Supreme Court at its word when it reaffirmed in *Graham* that "classifications based on alienage . . . are inherently suspect and subject to close judicial scrutiny." 403 U.S. at 372.

Stated differently, the majority apparently believes that the Supreme Court's generally applicable pronouncements should not be applied to a narrower context that they ostensibly cover unless and until the Court does so itself. Yet despite its avowed reluctance to jump ahead of the Supreme Court, this is precisely what the majority has done. Its holding in effect presumes that the Supreme Court would withhold suspect-class designation from nonimmigrant aliens if it were to decide that precise issue. *See LeClerc*, 444 F.3d at 429 (Higginbotham, J., dissenting from the denial of rehearing en banc) (describing the *LeClerc* majority's decision to exclude nonimmigrant aliens from suspect-class designation as "a bold step not sanctioned by Supreme Court precedent"). This holding not only is inconsistent with the Supreme Court's more general language regarding alienage, but arrogates the very power upon which the majority professes to be so reluctant to infringe.

I believe that the canons of statutory interpretation provide a useful, albeit inexact, analogy to the situation before us. All federal courts, including this one, are well aware that "[o]ne of the most basic canons of statutory interpretation is that a more specific provision takes precedence over a more general one." *See United States v. Perry*, 360 F.3d 519, 535 (6th Cir. 2004) (citing *Green v. Bock Laundry Mach. Co.*, 490 U.S. 504, 524 (1989), and *Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 153 (1976)). A corollary of this canon is that "[a] general statutory rule usually does not govern *unless there is no more specific rule*." *Green*, 490 U.S. at 524 (emphasis added). In the absence of a more specific rule, in other words, the general rule governs.

The majority's holding in the present case is inconsistent with these well-established and uncontroversial principles of law. It ignores the Supreme Court's general rule that aliens constitute a suspect class and, following the *LeClerc* majority, creates a more specific rule for nonimmigrant aliens where no such rule otherwise exists. I am not familiar with any authority that permits the lower federal courts to interpret Supreme Court precedent in this manner, which is totally at odds with the widely accepted method for interpreting federal statutes.

To be sure, the lower federal courts interpret Supreme Court caselaw to create their own in-circuit law all the time. That is, after all, our job. *See Northcross v. Bd. of Educ.*, 302 F.2d 818, 824 (6th Cir. 1962) ("[T]his Court must follow the supreme law of the land, as interpreted by the Supreme Court."). But creating in-circuit law as a natural extension of Supreme Court precedent to meet new facts patterns, on the one hand, and sua sponte carving out exceptions to still-good Supreme Court law to do so, on the other, are vastly different things. *See West v. Anne Arundel*

*County*, 137 F.3d 752, 757 (4th Cir. 1998) ("Our task . . . is not to predict what the Supreme Court might do but rather to follow what it has done.").

This case presents a number of serious constitutional questions, the least of which, somewhat ironically, is the merits issue of whether the Tennessee driver's license law runs afoul of the Equal Protection Clause of the Fourteenth Amendment. Answering that question can come only after a determination of the appropriate standard of review, which itself must follow a decision as to whether the individuals burdened by the law under review fit within a "suspect" classification. This initial determination is the most critical of the three, in my opinion, because beyond simply setting the analysis in motion, it necessarily expresses a value judgment as to the status of legal aliens in our society. *See Foley*, 435 U.S. at 294 ("The decisions of this Court with regard to the rights of aliens living in our society have reflected fine, and often difficult, questions of values."). Most lower-court judges are unsurprisingly and properly cautious in making those value judgments as a matter of course, and I share the majority's inclination to defer to the Supreme Court to do so in this case. But contrary to the majority's shying-away rationale, the Supreme Court *has* spoken regarding the individuals at issue here, having proclaimed unequivocally in *Graham* that "classes based on alienage, like those based on nationality or race, are inherently suspect and subject to close judicial scrutiny." *Graham*, 403 U.S. at 372.

As noted above, the Supreme Court has carved out only a single exception to this general rule, holding in *Plyler v. Doe*, 457 U.S. 202, 219 n.19 (1982), that *illegal* aliens are not members of a suspect class and that state classifications against them are accordingly subject to the far-more-forgiving rational-basis standard of review. That the number of exceptions remains at only one a quarter of a century after *Plyler* is especially pertinent to the present case because, during the very year that *Plyler* was decided, the Court confronted—but explicitly bypassed—an opportunity to create an exception that would have covered the subclass of aliens at issue here. *See Toll v. Moreno*, 458 U.S. 1, 9-10 (1982) (determining that, because the University of Maryland's policy of denying nonimmigrant-alien students the "in-state" discount that both citizen and immigrant-alien students received for tuition and fees violated the Supremacy Clause of the Constitution, "[w]e . . . have no occasion to consider whether the policy violates the Due Process or Equal Protection Clauses").

In bypassing the equal-protection question in *Moreno*, moreover, the Supreme Court necessarily left undisturbed the district court's holding, later adopted without qualification by the Fourth Circuit, that all legal aliens "who maintain their place of general abode within the United States," whether "immigrant or nonimmigrant" aliens, are "wrapped . . . in the suspect classification blanket" and entitled to have laws that discriminate against them subjected to strict scrutiny. *Moreno v. Toll*, 489 F. Supp. 658, 663-64 (D. Md. 1980), *aff'd by Moreno v. Univ. of Maryland*, 645 F.2d 217, 220 (4th Cir. 1981) (per curiam) (affirming the district court's equal-protection holding "[f]or reasons sufficiently stated by the district court"). Reading *Plyler* and *Moreno* in conjunction with *Graham* yields the inescapable conclusion that all lawfully admitted aliens—permanent and temporary alike—remain members of an inherently suspect class.

## II. CONCLUSION

For all of the reasons set forth above, I would reverse the judgment of the district court and remand the case for reconsideration under the strict-scrutiny standard of review. I therefore respectfully dissent.