NOT RECOMMENDED FOR PUBLICATION
File Name: 20a0428n.06

Case No. 19-1808

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

|  |  |  |
|---|---|---|
| DIRECT CONSTRUCTION SERVICES, LLC; TIMOTHY DRAKEFORD, | ) ) ) | |
| Plaintiffs-Appellants, | ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN |
| v. | ) ) ) | |
| CITY OF DETROIT, MICHIGAN; DETROIT LAND BANK AUTHORITY; DETROIT BUILDING AUTHORITY; TAMMY DANIELS; IRENE TUCKER; BOYSIE JACKSON; RON CRAWFORD; TIMOTHY PALAZZOLO; BRIAN FARKAS; MICHAEL EDWARD DUGGAN, | ) ) ) ) ) ) ) ) ) | |
| Defendants-Appellees. | | |

**FILED**
Jul 23, 2020
DEBORAH S. HUNT, Clerk

Before: MERRITT, GUY, and STRANCH, Circuit Judges.

**MERRITT, Circuit Judge.** This is an appeal from the dismissal, pursuant to Federal Rule of Civil Procedure 12(b)(6), of a civil rights action bringing claims under federal and state law. Plaintiffs are an African-American individual, Timothy Drakeford, and his company, Direct Construction Services. Defendants are the City of Detroit, a municipal entity, the Detroit Building Authority, a public-private corporation, and the Detroit Land Bank Authority, also a public-private corporation. Multiple individuals employed by these entities were also sued exclusively in their official capacities.

The Land Bank administers and oversees a program that distributes federal funds to demolish and clean up abandoned properties in Detroit. Plaintiffs participated in this program by bidding on and being awarded a number of demolition contracts by the Land Bank. The Office of the Inspector General for the City of Detroit determined that plaintiffs had altered photographs of properties they demolished in breach of the terms of their contracts. The crux of plaintiffs' complaint stems from the fact that the Land Bank barred plaintiffs from continued participation in the demolition program.

Plaintiffs allege that they were suspended and later barred from further demolition work, and did not receive payment for completed work, on the basis of race. They also claim that defendants retaliated against them because plaintiff Drakeford refused to alter bid numbers for the demolition work, and because Drakeford allegedly cooperated with the FBI during a federal investigation into the Land Bank's administration of the demolition program. Plaintiffs provide neither dates nor identities of individuals that would support these allegations, and plaintiffs fail to connect Drakeford's alleged actions to the claimed retaliation. The complaint relies on speculation and legal conclusions framed as "allegations." Plaintiffs' complaint fails adequately to allege facts supporting any cognizable constitutional violations, and fails to allege facts that, if proved, would show that any similarly situated company was treated differently. The claims against the individuals sued exclusively in their official capacities were properly dismissed because they are duplicative of the claims against the entities for which the individuals work. The district court did not exercise supplemental jurisdiction over the state-law claims, including breach of contract, and it dismissed those claims without prejudice.

Plaintiffs argue on appeal that if they were able to conduct discovery they would find factual support for their claims of race discrimination, retaliation, or other unjust treatment. But even with

a generous reading of the complaint and its many attachments, plaintiffs have not set forth allegations sufficient to raise their claims of race discrimination and retaliation above a speculative level. We therefore affirm the judgment of the district court.

## I. Facts and Procedural History

The facts related below are taken from the complaint and its attached exhibits.[1] Plaintiff Timothy Drakeford and his company, plaintiff Direct Construction Services, participated in a program in Detroit called "Hardest Hit Funds," which permitted local municipalities to receive and distribute funding from the U.S. Treasury pursuant to the Emergency Economic Stabilization Act of 2008. A number of state, federal, municipal and quasi-public organizations and agencies are involved in the program. The Detroit Land Bank Authority, a quasi-governmental entity, was formed to administer federal funds from the Hardest Hit program in Detroit. As part of the Hardest Hit program, the Land Bank may utilize federal funds for the demolition of residential housing that poses a safety and/or health risk. Complaint ¶ 21; Ex. 1. The Detroit Building Authority, also a quasi-public entity, contracted with the City of Detroit to coordinate and implement a demolition program, which terms are set forth in the Demolition Management Agreement. Complaint at Ex. 2. The Land Bank, as the distributor of the federal funds, is the entity that contracts with the demolition companies. *See Id*. ¶¶ 22; Ex. 11. Minority contractors were solicited and encouraged to bid on demolition contracts. Direct Construction, a licensed and certified residential builder, bid on and was awarded contracts for demolition work on approximately 48 properties. Complaint Ex. 11. Plaintiffs allege that the demolition contracts were not awarded and administered in a fair

---

[1] In ruling on a motion to dismiss, the court may consider the complaint as well as (1) documents that are referenced in the plaintiff's complaint and that are central to plaintiff's claims, (2) matters of which a court may take judicial notice, (3) documents that are a matter of public record, and (4) letters that constitute decisions of a governmental agency. *Thomas v. Noder-Love*, 621 F. App'x 825, 829 (6th Cir. 2015).

and nondiscriminatory manner, "as reflected in the numerous news articles as well as personal experiences of many minority contractors." *Id*. ¶ 23. None of the "numerous news articles" or "many minority contractors" are specifically identified in the complaint.

Plaintiffs also claim that "some contractors including Plaintiffs were asked to change bidding and cost numbers after the initial invoicing to reflect compliance under the Hardest Hit Homeowners guidelines." *Id*. ¶ 24. This allegation apparently relates to an interview Drakeford gave to the Detroit News where he said he was approached and refused to "change numbers." *Id*. ¶ 25; Ex. 3 (news article dated Nov. 3, 2016). The date of the request and the individual who asked Drakeford to change bid numbers are not identified. The news article explains that the Land Bank and the Detroit Building Authority "commissioned an independent audit of the federally funded program" in the summer of 2016. The audit revealed that certain demolition costs had exceeded the federal cap, and that a former Building Authority employee, Aradondo Haskins, had improperly asked some of the demolition contractors to change their bid sheets after the work had been completed and invoiced in order to redistribute the excessive costs. *Id*. Ex. 3.[2] The news article concludes by saying that, in light of the audit, the Land Bank and the U.S Treasury came up with new procedures that went into effect in October 2016. Neither the Land Bank nor Direct Construction were accused of wrongdoing arising from the audit.

The complaint then alleges that plaintiffs "notice[d] that its payments were delayed and much more difficult to obtain from the [Land Bank] than larger white companies, such as Adamo and Homrich." Complaint ¶ 35. Plaintiffs also allege that minority contractors like them were "forced to do work outside the scope of the contract including cleaning trash from previous [sic] cleared

---

[2] According to a separate news article submitted by plaintiffs as an exhibit to their motion for reconsideration of the order granting the motion to dismiss, Haskins was later indicted by federal authorities for unauthorized use of federal funds.

properties." *Id*. Plaintiffs allege that this "unfair treatment" became "very noticeable" and "an investigation into the hefty payments to white companies began." This allegation lacks basic information, including which contracts resulted in delayed payments, who "forced" plaintiffs to clean trash from properties, and when the incidents occurred.

Plaintiffs then allege that they received an immediate "Stop Work Order" in a letter from the Land Bank dated December 19, 2016. *Id*. ¶ 37. Plaintiffs allege that the letter contained no explanation for the Stop Work Order, but the letter itself, which is attached to the complaint, states that it is being issued due to "an ongoing investigation by the Office of the Inspector General of the City of Detroit into work performed by Direct Construction Services, LLC." *Id*. Ex. 12.[3] An investigation by the Detroit Inspector General into plaintiffs' performance of its contract began on December 1, 2016, and arose from routine monitoring of the contracts receiving federal funding. Contrary to their allegation, plaintiffs knew the reason for the Inspector General's investigation into their contract performance on December 19 when they received the stop-work letter because plaintiff Drakeford had been interviewed by the Inspector General on December 8. Because the Report is attached to the complaint, and was issued by a governmental agency, we may consider the facts in the Report.

According to the Report, the Inspector General received a complaint from the Land Bank on December 1, 2016, pursuant to routine monitoring of its demolition contracts. The Land Bank told the Inspector General that it suspected that plaintiffs had submitted altered photographs of the

---

[3]The complaint omits many facts concerning the investigation into plaintiffs' performance under its contracts. A full recitation of the facts can be found in the Inspector General's Report, which was issued on February 1, 2017, and is attached to the complaint. Ex. 21.

sidewalks adjacent to five of the properties plaintiffs had demolished. *See* Complaint ¶ 44; Ex. 21.[4]

According to the Inspector General's Report, one of its investigators interviewed plaintiff Drakeford on December 8, 2016, and Drakeford explained that he takes before and after photographs with his phone and that his company, Direct Construction, hires subcontractors to repair sidewalks. Drakeford subsequently identified the subcontractor as a Dan Daville or Dan Danville. On January 5, 2017, Drakeford provided the investigator with a photocopy of a cancelled check from May 2016 made out to a Dan Danvillarreal [sic] for $ 2,200 with a notation that it was for "Refund/Sidewalk Repair." Report at 4. The Inspector General contacted Dan Villarreal, who said he had not done any work for plaintiffs recently and had never altered photographs. Villarreal said the May 2016 check was a refund from plaintiffs for a demolition job plaintiffs were supposed to do for a private customer of Villarreal's. Report at 5. Drakeford stated that he did not verify that the subcontractor repaired the sidewalks on the five properties at issue, relying instead on the fact that the subcontractor had pulled the sidewalk permits. Drakeford was unable to provide evidence of the permits to the investigator.

According to the Inspector General Report, Drakeford was shown the photographs of the five properties and agreed that they looked altered but stated that the subcontractor took the photographs and was responsible for forwarding the photos to Drakeford. Drakeford explained to the investigator that he broke his phone and was unable to produce the photographs he received from the subcontractor. Drakeford admitted to adding some "green spots" to at least one of the photographs in an effort to conceal tires that were on the property. Drakeford justified the

---

[4] The demolition contractors are required by the terms of their contracts with the Land Bank to submit "before and after" photographs of sidewalks, drive approaches, neighboring residences and/or structures, near properties to be demolished. The contractors are required to protect sidewalks from damage or pay to repair or replace any damage resulting from the demolition work.

alterations by stating that contractors were told to "brush out the tires" at a meeting with the Michigan State Housing Development Authority in the spring of 2016. *Id.* Plaintiffs also allege that a Land Bank employee advised Drakeford that if he had problems "cropping" the photos of the sites, she would assist him. Complaint ¶ 43. In emails attached to the complaint, the instruction by the Land Bank related only to cropping photos in order to fit the site within the photograph. The emails do not instruct contractors to alter photographs to erase tires. *See* Complaint Ex. 20.

The Inspector General's forensic analysis of the photographs determined that plaintiffs had submitted falsified photographs for payment, that Drakeford admitted to altering at least one of the photographs, and that he tried to shift blame to a subcontractor who could not corroborate Drakeford's version of events. The Report concluded that all the falsified photographs were taken with a Samsung phone like the one owned by Drakeford. Report at 8. The Inspector General's "Conclusion" in the Report states:

> The [Land Bank] should be credited with discovering issues with the five properties in question through its normal review process. The [Inspector General] is aware that Direct Construction has demolished other properties for [the Land Bank]. Neither the [Land Bank] nor [the Inspector General] have specific information at this point indicating that Direct Construction failed to perform its work on other projects in a manner consistent with its contractual obligation. No issues were detected in earlier reviews. But given the false information submitted regarding the five properties, the [Inspector General] is concerned about the accuracy of all of the information submitted by Direct Construction. Direct Construction should not be paid for completed work until [the Land Bank] verifies through appropriate means that the work has in fact been done satisfactorily. Once the [Land Bank] is satisfied that all work has been completed as contractually specified, the [Land Bank] should evaluate whether payment is warranted.
>
> . . .
>
> The[Land Bank] should reevaluate its relationship with Direct Construction moving forward. Direct Construction submitted falsified photo for payment. Mr. Drakeford admitted to removing tires and other debris out of a photo . . . because he knew the property in its current condition would not be acceptable to [the Michigan State Housing Development Authority.] However, he did not take

> responsibility for the other four properties [where falsified photos were submitted]. Instead, Mr. Drakeford blamed a subcontractor. The [Inspector General] attempted to verify Mr. Drakeford's assertion but the subcontractor denied ever doing work for Direct Construction. . . . [T]he City of Detroit Department of Public Works . . . indicated that no sidewalk permits existed for the 5 properties. Additionally, Mr. Drakeford was unable to provide documentation to suggest that a subcontractor was indeed responsible.
>
> . . .
>
> Based on Mr. Drakeford's actions, the [Land Bank] should not allow Direct Construction to do work for the City of Detroit's demolition program. . . . At best, Direct Construction was negligent . . . . At worst, the firm acted in a purposely deceitful manner. In the future, the [Land Bank] and the City of Detroit should not continue its relationship with such contractors.

*Id*. at 7-8 (footnotes omitted).

The complaint narrative omits most of the information from the Inspector General's Report. Instead, plaintiffs allege simply that they received a letter from the Land Bank dated February 17, 2017, refusing to pay plaintiffs for work at five properties based on the Inspector General's Report. Complaint ¶ 38; Ex. 14. Plaintiffs then allege that instead of being allowed to complete the work, plaintiff Drakeford was called into a meeting with the Land Bank and told he was indefinitely suspended. *Id*. ¶ 39; Exs. 15, 16. Plaintiffs try to frame the suspension as retaliatory by alleging that Drakeford was questioned by the FBI regarding "issues" at the Land Bank, but the complaint gives no indication of the subject matter or the timeframe of any FBI questioning of Drakeford. *Id*. ¶ 40. Plaintiffs were later removed from the list of suspended contractors. *Id*. ¶ 41; Ex. 17.

Plaintiffs allege that they were unable to get paid by the Land Bank during this time, causing several vendors to call in their bonds. *Id*. ¶ 42; Ex. 19. Plaintiffs allege that the Land Bank, "through Tammy Daniels, Irene Tucker, Boysie Jackson, Ron Crawford, Timothy Palazzolo, and Brian Farkas," acted in concert to allege and create a bogus picture of fraud by plaintiffs. Plaintiffs allege that this was "outrageous" because the conduct that Drakeford was accused of, and his

company suspended for—altering photos of sidewalks—was directed by the Land Bank and the Building Authority. *Id.* ¶ 43. Plaintiffs continued to try to get paid for work already performed, but were unsuccessful. *Id.* ¶¶ 45-46; Exs. 24-27. Plaintiffs allege that the Land Bank, the Building Authority and the City of Detroit "collude[d] and retaliate[d] against contractors such as Plaintiffs." *Id.* ¶ 47. Plaintiffs allege that they were "suspended not because of work quality but because of a refusal to change numbers in bid packages." *Id.* Plaintiffs also allege that defendants Ron Crawford, Tim Palazzolo, and Tammy Daniels suspended plaintiffs without due process and created a disciplinary policy that they applied retroactively. *Id.*

In Count I, plaintiffs claim violations of 42 U.S.C. § 1981. They allege that "defendants"— no specific defendant is mentioned in Count I—discriminated against them on the grounds of race or color, and denied plaintiffs the rights and privileges that white citizens enjoy. They also claim that they have performed under their contracts but have not been paid in the same way that "white counterparts" have been paid. Complaint ¶¶ 50-53.

Count II claims due-process violations under 42 U.S.C. § 1983. Plaintiffs allege that defendants Ron Crawford, Tim Palazzolo and Tammy Daniels "violated Plaintiffs due process rights by suspending Plaintiff [sic] for violating a policy that had not been created . . . and failed to apprise Plaintiffs of any appeal process. . . ." Complaint ¶ 57. Plaintiffs further claim that the same three defendants violated due process "by improperly suspending Plaintiff Drak[e]ford, and even more outrageous, create [sic] a disciplinary policy after the discipline, and in violation of location ordnances [sic] and City of Detroit Charter." *Id.* ¶ 58.

In Count III, captioned "Retaliation," plaintiffs claim that "defendants" and specifically Brian Farkas, retaliated against plaintiffs because "Plaintiff refused to change numbers in a bid package. Defendant Brian Farkas open [sic] and publicly stated that plaintiffs would never work for the

[Land Bank] or [Building Authority] again and within 60 days, Plaintiffs' [sic] were suspended and under a stop work order under [sic], although white counterparts were not suspended or subjected to retaliation." *Id.* ¶ 60. Plaintiffs further allege that "Plaintiff was singled out with retaliation after refusing to change numbers and for cooperating with the FBI during their investigation in the Detroit area after Plaintiff Timothy Drakeford." [sic] *Id.* ¶ 61.

The remaining three counts bring claims under state law: Count IV alleges a violation of Elliot Larsen Civil Rights Act; Count V alleges breach of contract against the Detroit Land Bank and "all Defendants in their official capacity" for breach of the agreement by failing to perform; and Count VI alleges a claim for "Concert of Action."

Defendants moved to dismiss under Rule 12(b)(6). The district court granted the motions on the federal claims as to all defendants, and it declined to exercise supplemental jurisdiction over the state claims, dismissing them without prejudice. *Direct Constr. Servs., LLC, v. City of Detroit*, No. 18-cv-12356, 2019 WL 1897128 (E.D. Mich. Apr. 29, 2019). Plaintiffs filed a motion for reconsideration, which was denied. *Direct Constr. Servs., LLC, v. City of Detroit*, No. 18-cv-12356, 2019 WL 2743533 (E.D. Mich. July 1, 2019). This appeal followed.

## II. Discussion

### A. Legal Standard for Reviewing Grant of Motion to Dismiss

This court reviews *de novo* a district court's grant of a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). *Jones v. City of Cincinnati*, 521 F.3d 555, 559 (6th Cir. 2008). Under Federal Rule of Civil Procedure 8(a)(2), a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." It will survive a motion to dismiss if the plaintiff alleges facts that "state a claim to relief that is plausible on its face" and that, if accepted as true, are sufficient to "raise a right to relief above the speculative level." *Bell Atl. Corp. v.*

*Twombly*, 550 U.S. 544, 555, 570 (2007); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The complaint must "contain either direct or inferential allegations respecting all material elements to sustain a recovery under some viable legal theory." *Eidson v. Tenn. Dep't of Children's Servs.*, 510 F.3d 631, 634 (6th Cir. 2007) (citing *Mezibov v. Allen*, 411 F.3d 712, 716 (6th Cir. 2005)).

When reviewing a motion to dismiss under Rule 12(b)(6), we must "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Handy-Clay v. City of Memphis*, 695 F.3d 531, 538 (6th Cir. 2012). We need not accept as true "a legal conclusion couched as a factual allegation," *Twombly*, 550 U.S. at 555 (citation and internal quotation marks omitted), or an "unwarranted factual inference." *Directv v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007) (citation and internal quotation marks omitted). We have reiterated that "[t]o survive a motion to dismiss, a litigant must allege enough facts to make it plausible that the defendant bears legal liability. The facts cannot make it merely possible that the defendant is liable; they must make it plausible." *Agema v. City of Allegan*, 826 F.3d 326, 331 (6th Cir. 2016) (citing *Iqbal*, 556 U.S. at 678) (internal citation omitted); *see League of United Latin Am. Citizens v. Bredesen*, 500 F.3d 523, 527 (6th Cir. 2007) ("The factual allegations, assumed to be true, must do more than create speculation or suspicion of a legally cognizable cause of action; they must show *entitlement* to relief.") (emphasis in original).

## B. The Individual Defendants Are Named Only in Their Official Capacities

"An individual-capacity claim is distinct from a claim against a defendant in his official capacity. The former claim may attach personal liability to the government official, whereas the latter may attach liability only to the governmental entity." *Essex v. Cty. of Livingston*, 518 F. App'x 351, 354 (6th Cir. 2013) (citing *Kentucky v. Graham*, 473 U.S. 159, 165–67 (1985))

(internal citation omitted). "In other words, an official-capacity claim is merely another name for a claim against the municipality." *Id*. (citing *Cady v. Arenac Cty*., 574 F.3d 334, 342 (6th Cir. 2009)); *see also Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989) (An action premised on an official-capacity claim "is not a suit against the official but rather is a suit against the official's office.").

Plaintiffs sued three entities, the City of Detroit, the Detroit Building Authority, and the Detroit Land Bank Authority, along with multiple officers and employees of those entities expressly in their official capacities only. The caption of the complaint expressly designates that each of the individual defendants is being sued "in his [or her] official capacity," and the allegations in the complaint defining these individuals reiterates that each is named "in his [or her] official capacity." Complaint ¶¶ 7-12. Nothing in the complaint suggests individual capacity claims against any of the individual defendants. Given plaintiffs' unambiguous reference to the individual defendants only in their official capacities, the plaintiffs' claims against each individual defendant were properly dismissed.

### C. <u>Plaintiffs Fail to State a Municipal Liability Claim Under § 1983 Against the City of Detroit, the Detroit Building Authority, and the Detroit Land Bank</u>

To succeed on their § 1983 federal constitutional claims in Count II (due process) and Count III (retaliation), plaintiffs must allege that a policy or custom of the entity is responsible for their injuries. A local government entity violates § 1983 when an official policy or custom deprives an individual of her constitutional rights. *Monell v. New York Dept of Soc. Servs*., 436 U.S. 658 (1978); *Leach v. Shelby Cty. Sheriff*, 891 F.2d 1241, 1245 (6th Cir. 1989) ("[B]efore a local government can be held liable for injuries under section 1983, whether the suit is pleaded as an official capacity suit or a suit against the local government, a plaintiff must show that his injuries were the result of some 'policy or custom' attributable to the governmental entity.").

A municipality "may not be sued under § 1983 for an injury inflicted solely by its employees or agents." *Monell*, 436 U.S. at 694. We have recognized specific parameters for establishing a *Monell* claim. A plaintiff can make a showing of an illegal policy or custom by demonstrating one of the following: (1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations. *See Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005).

In its order denying plaintiffs' motion for reconsideration, the district court succinctly summed up the problem with plaintiffs' § 1983 claims and the reason they could not survive a motion to dismiss:

> Plaintiffs' claims in this case have been a moving target of confusingly articulated theories of liability. The Plaintiffs expressly sued only municipal Defendants and individual Defendants in their official capacities, yet the Complaint did not assert any type of policy claim under *Monell v. Department of Social Servs.*, 436 U.S. 658 (1978), and did not identify any policy, custom, or practice as the basis for such a claim. Nor did Plaintiffs reference or discuss any such policy, custom, or practice in their briefing on the motions to dismiss. The Complaint contained no factual content plausibly suggesting a *Monell* claim . . . .

2019 WL 2743533, at *2. Plaintiffs argue on appeal, as they did in their motion for reconsideration below, that the "policy" basis for their *Monell* claims is tolerance of or acquiescence in federal-rights violations. This claim was not timely raised below, and, in any event, plaintiffs have not identified facts supporting a pattern of racial intolerance or acquiescence by any of the three entity defendants. The complaint does not distinguish the conduct of one entity from another, let alone allege a plausible policy claim against each one of them.

Count II alleges that plaintiffs were deprived of due process because Drakeford was improperly suspended from the contractor list based on "a disciplinary policy" that was instituted

after the suspension had been imposed. Complaint ¶ 58; Plaintiffs' Response to the Detroit Land Bank's Motion to Dismiss at 3 ("the policy Plaintiff was suspended under was not created until after he was disciplined."). As the alleged policy, which plaintiffs do not articulate, was created after the suspension, it could not have caused the Inspector General's investigation into Direct Construction or the issuance of the stop work order to the company. Count II was properly dismissed.

In Count III, the retaliation claim, plaintiffs allege that the motivating force behind the suspension was either race discrimination or retaliation for plaintiffs' cooperation with the FBI. However, there are no dates or other facts temporally relating plaintiffs' suspension to anything he may have said to the FBI. Plaintiffs include no facts as to the nature of their "cooperat[ion] with the FBI." Plaintiffs' complaint fails to set forth facts that, if proven, demonstrate that plaintiffs were suspended from the demolition program in retaliation rather than as a legitimate response to their own conduct in falsifying photographs.

As for any retaliation on the basis of race, other than invoking his African-American ethnicity and the fact that Direct Construction is minority owned, plaintiffs offer no facts demonstrating any discriminatory policies or customs other than a bald allegation that "white counterparts were not suspended or subjected to retaliation." Plaintiffs plead no facts plausibly suggesting that the "white contractors" referred to in the complaint, "Adamo" and "Homrich," were "similarly situated" to the plaintiffs or were treated differently. There is no allegation or evidence that either company submitted altered photographs pursuant to their demolition contracts but had not been disciplined or suspended. The conclusory allegations that plaintiffs were treated differently from two white contractors fail to state a retaliation claim "that is plausible on its face." *Twombly*, 550 U.S. at 570.

Plaintiffs fail to meet the threshold pleading standard as to a *Monell* claim against the City of Detroit, the Detroit Building Authority, or the Detroit Land Bank. None of the allegations in the complaint plausibly suggest how any policy, custom, or practice of any of the three municipal or quasi-municipal entity defendants could support a claim of municipal liability.

### D. Plaintiffs Fail to State a Claim Under § 1981

Enacted as part of the Civil Rights Act of 1866, 42 U.S.C. § 1981 provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts" without regard to race. The statute defines the phrase "make and enforce contracts" to include the "making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b). However, "§ 1983 provides the exclusive remedy for constitutional violations." *Foster v. Michigan*, 573 F. App'x 377, 391 (6th Cir. 2014). We have held that a "plaintiff cannot use § 1981 to sue a state actor in his or her official capacity." *McCormick v. Miami Univ.*, 693 F.3d 654, 660 (6th Cir. 2012) (citing *Grinter v. Knight*, 532 F.3d 567, 577 (6th Cir. 2008) ("§ 1983 provides an exclusive remedy for violations against state actors sued in their official capacities. An official capacity lawsuit against . . . a state actor[ ] for constitutional violations, such as race discrimination, cannot be brought under § 1981.") (alterations in original)). As the Supreme Court explained in *Jett v. Dallas Independent School District*, 491 U.S. 701 (1989):

> Given our repeated recognition that the Fourteenth Amendment was intended in large part to embody and expand the protections of the 1866 Act as against state actors, we believe that the logic of these decisions applies with equal force to petitioner's invitation to this Court to create a damages remedy broader than § 1983 from the declaration of rights now found in § 1981. We hold that the express "action at law" provided by § 1983 for the "deprivation of any rights, privileges, or immunities secured by the Constitution and laws," provides the exclusive federal

> damages remedy for the violation of the rights guaranteed by § 1981 when the claim is pressed against a state actor. Thus to prevail on his claim for damages against the school district, petitioner must show that the violation of his "right to make contracts" protected by § 1981 was caused by a custom or policy within the meaning of *Monell* and subsequent cases.

*Id.* at 735-36. Accordingly, § 1983 is the sole vehicle for plaintiffs' damage claim, and, as described above, plaintiffs fail to state a policy claim against the entity defendants under § 1983. Plaintiffs' § 1981 claim is not saved because they request injunctive relief. The remedy for past discrimination, which is all that plaintiffs plead, is monetary damages. We affirm the dismissal of plaintiffs' claim under 42 U.S.C. § 1981.

### E. Supplemental Jurisdiction Over Plaintiffs' State Law Claims

Given the absence of a viable federal claim, the district court declined to exercise supplemental jurisdiction over plaintiffs' state law claims against all defendants under the Elliot-Larsen Civil Rights Act, Mich. Comp. Laws § 37.2501, *et seq.*, for breach of contract, and for concert of action. It dismissed them without prejudice, and plaintiffs are free to file these claims in state court.

### F. Denial of Motion for Reconsideration

The district court properly denied plaintiffs' motion for reconsideration. Under Rule 59(e), parties cannot use a motion for reconsideration to raise new legal arguments that could have been raised before a judgment was issued. *Sault Ste. Marie Tribe of Chippewa Indians v. Engler*, 146 F.3d 367, 374 (6th Cir. 1998) (stating that "[a] motion under Rule 59(e) is not an opportunity to re-argue a case"). Rather, a motion under Rule 59(e) must either clearly establish a manifest error of law or must present newly discovered evidence. *Roger Miller Music, Inc. v. Sony/ATV Publ'g LLC*, 477 F.3d 383, 395 (6th Cir. 2007); *see also Walker v. Mich. Dep't of Corr.*, 128 F. App'x 441, 447 (6th Cir. 2005).

Plaintiffs based their motion for reconsideration on two exhibits attached to the motion. The first was a Detroit Office of the Inspector General Report from December 2018 issued after an investigation into "large-unit" contractor meeting. Plaintiffs were not involved in the large-unit contractor meeting or the Inspector General's investigation in any way. In any event, the Report concluded, "[b]ased on our review of documents and interviews conducted for this particular matter, we conclude the large-unit contractor meeting did not violate any existing [Land Bank] policies pertaining to the use of the Hardest Hit Funds." The other exhibit is an article from the Detroit News dated April 8, 2019. It reports on the filing of federal embezzlement charges against two men, one of whom is Aradondo Haskins, the former Detroit Building Authority employee who was involved in the bid-altering issue. Plaintiffs do not explain how the indictment of Haskins affects their claims. A federal audit cleared the Land Bank of any wrongdoing related to Haskins' misconduct while he was an employee of the Detroit Building Authority. There is no information in either exhibit that has any bearing on plaintiffs' claims.

For the foregoing reasons, we affirm the judgment of the district court.